No. 13-465C
(Judge Sweeney)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FAIRHOLME FUNDS, INC., *et al.,*

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S MOTION FOR PROTECTIVE ORDER

STUART F. DELERY
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

KENNETH M. DINTZER
Acting Deputy Director
ELIZABETH M. HOSFORD
GREGG M. SCHWIND
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:  (202) 616-0385
Facsimile:   (202) 307-0972
Email: KDintzer@CIV.USDOJ.GOV

Attorneys for Defendant

May 30, 2014

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION AND SUMMARY ........................................................................................1

ARGUMENT ..........................................................................................................................4

    I.    Requests For Documents Relating To The Future Termination Of The
Conservatorships And Future Profitability Of The Enterprises Interfere
With The Operation Of The Conservatorships In Violation Of HERA
And Impermissibly Intrude Into The Deliberative Process ...................................4

        A.    Permitting The Discovery Requested By Plaintiffs
Would Be Contrary To HERA.....................................................................5

        B.    Deliberations Regarding The Future Of The Enterprises Are Also
Protected By The Deliberative Process Privilege ......................................10

    II.    Plaintiffs' Requests Exceed The Scope Of The February 26 Order ......................18

CONCLUSION......................................................................................................................21

## TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Boye v. United States,*
    2008 WL 1990866 (Fed. Cl. Mar. 4, 2008) ...................................................18

*Cienega Gardens v. United States,*
    503 F.3d 1266 (Fed. Cir. 2007)......................................................................17

*Coastal States Gas Corp. v. DOE,*
    617 F.2d 854 (D.C. Cir. 1980) ........................................................................11

*County of Sonoma v. FHFA,*
    710 F.3d 987 (9th Cir. 2012) .......................................................................5, 6

*Dep't of Interior v. Klamath Water Users Protective Ass'n,*
    532 U.S. 1 (2001)............................................................................................10

*Dudman Commc'ns v. Dep't of the Air Force,*
    815 F.2d 1565 (D.C. Cir. 1987) ......................................................................11

*Envtl. Prot. Agency v. Mink,*
    410 U.S. 73 (1973) ........................................................................................11

*FHFA v. UBS Americas Inc.,*
    712 F.3d 136 (2d Cir. 2013)..............................................................................5

*Fairholme Funds, Inc. v. FHFA,*
    No. 13-cv-1053 (D.D.C.) (filed Dec. 17, 2013)..............................................18

*In re Fed. Home Loan Mortgage Corp. Derivative Litig.,*
    643 F. Supp. 2d 790 (E.D. Va. 2009) ...............................................................7

*Iris Corp. Behad v. United States,*
    84 Fed. Cl. 489 (2008) ......................................................................................5

*Lakeland Partners, LLC v. United States,*
    88 Fed. Cl. 124 (2009) ....................................................................................18

*La. Mun. Police Employees Ret. Sys. v. FHFA,*
    434 F. App'x 188 (4th Cir. 2011)......................................................................7

*Marriott Intern. Resorts, L.P. v. United States,*
    437 F.3d 1302 (Fed. Cir. 2006)............................................................16

*Nat'l Trust for Historic Preserv. v. FDIC,*
    995 F.2d 238 (D.C. Cir. 1993) ...........................................................17

*Nat'l Trust for Historic Preserv. v. FDIC,*
    21 F.3d 469 (D.C. Cir. 1994) .............................................................17

*Nat'l Sec. Archive v. CIA,*
    _ F.3d _, 2014 WL 2053829 (D.C. Cir. May 20, 2014) .........................3, 10, 16

*Quarles v. Dep't of the Navy,*
    893 F. 2d 390 (D.C. Cir. 1990) ..........................................................11

*Schott v. Dep't of Transp.,*
    229 Ct. Cl. 853, 854 (1982) ................................................................6

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir.1997) ............................................................16

*In re United States,*
    321 Fed. Appx. 953, 959 (Fed. Cir. 2009) .........................................11

*United States v. King,*
    395 U.S. 1 (1969).................................................................................6

*In re United States,*
    542 Fed. App'x. 944, 949 (Fed. Cir. 2013).......................................18

## FEDERAL RULES

RCFC 12(b)(6) ...................................................................................17

RCFC 26(c)(1) .....................................................................................1

## STATUTES

12 U.S.C. § 4617(b)(2)(A)....................................................................6

12 U.S.C. § 4617(e)(2).........................................................................7

12 U.S.C. § 4617(f)............................................................................2, 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FAIRHOLME FUNDS, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 13-465C |
| | ) | (Judge Sweeney) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR PROTECTIVE ORDER

## INTRODUCTION AND SUMMARY

Pursuant to Rule 26(c)(1) of the Rules of the United States Court of Federal Claims (RCFC) and the Court's orders dated February 26, 2014 (February 26 Order), and April 4, 2014, defendant, the United States, respectfully requests that the Court enter a protective order precluding plaintiffs from seeking certain discovery requested in plaintiffs' First Set of Requests for Production, dated April 7, 2014 (Plaintiffs' Requests).  Counsel for the Government has in good faith conferred with plaintiffs in an effort to resolve this dispute without court action.

**1.**  We ask the Court to limit discovery with respect to Request 1 and Requests 6-10 to documents created prior to August 17, 2012, the date of the Third Amendment. [1]  We have focused this request on the categories, and time period, of documents that have the closest relationship to the agencies' recent and ongoing deliberations and policymaking efforts regarding

---

[1] The United States served Defendant's Response To Plaintiffs' First Set of Requests for Production on May 2, 2014, and Defendant's Objections and Responses to Plaintiffs' First Set of Interrogatories on April 21, 2014.  The Government reserves all rights conferred by the Court's Rules to file a future motion for protective order or to seek other appropriate relief, regardless of whether the document(s) at issue were created prior to or after August 17, 2012, if additional disputes arise.  All documents produced by the Government will be reviewed for privilege, including, without limitation, the deliberative process and executive privileges, the attorney/client and bank examination privileges, and the work product doctrine, on a document-by-document basis, as appropriate.

the future of the Federal National Mortgage Association (Fannie Mae) and the Federal Home

Loan Mortgage Corporation (Freddie Mac) (collectively, the Enterprises).  Requests 6-10 seek

documents that relate in their entirety to the future termination of the conservatorships, with no

end date.  Request 1 seeks documents that relate (in part) to the future profitability of the

Enterprises, again with no end date.  Disclosure of these documents is contrary to the strictures

of the Housing and Economic Recovery Act of 2008 (HERA), which bars a court from taking

"any action to restrain or affect the exercise of powers or functions" of the Federal Housing

Finance Agency (FHFA) as conservator.  12 U.S.C. § 4617(f).  The declaration of FHFA

Director Melvin Watt explains that disclosure would "have extraordinarily deleterious

consequences on the Conservator's conduct of the ongoing and future operations of the

conservatorships."  Declaration of Melvin Watt, ¶ 3 (Watt Decl.), A1-7.[2]  Decisions about when

and how to terminate the conservatorships and the future profitability of the Enterprises are at the

heart of FHFA's responsibilities as conservator, and Court-mandated disclosure of information

bearing on such matters would jeopardize the stewardship of the Enterprises.

The same requests also categorically target documents at the heart of the deliberative

process privilege:  the express purpose of these requests is to uncover any deliberations regarding

how and when the conservatorships will end.  There can be no doubt that court-mandated

disclosure of such pre-decisional and ongoing communications would impair precisely the kind

of candid exchange of ideas that the deliberative process privilege is intended to protect.  The

requests would not only impact the conduct of the Conservator, but also threaten Treasury's

efforts to develop policy and help bring about comprehensive housing finance reform.  *See*

*generally* Declarations of Dr. Michael Stegman (Treasury) (Stegman Decl.) and Christopher

---

[2] "A_" refers to a page in the appendix to this motion.

Dickerson (FHFA) (Dickerson Decl.), A8-19 and A20-30, respectively (Stegman Decl. and Dickerson Decl.).  As the D.C. Circuit recently reaffirmed, "[i]f agencies were 'to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer." *Nat'l Sec. Archive v. CIA*, _ F.3d _, 2014 WL 2053829, *2 (D.C. Cir. May 20, 2014) (internal quotation marks and citation omitted).[3]

**2.**  More generally, plaintiffs have failed to limit discovery to the topics and time frames identified in the February 26 Order.  For example, although the February 26 Order authorized discovery into the solvency of the Enterprises and reasonable expectations of their future profitability at the time they were placed into conservatorships in 2008, Request 1 seeks all projections as to profitability "from the time Defendant began considering whether to place the Companies into conservatorship to the present[.]"  Requests 2, 3, and 5 also exceed the scope of the Court's order on this subject.

Similarly, this Court authorized discovery related to whether FHFA is the United States for purposes of the Tucker Act, which, under the Court's reasoning, would require a showing that "FHFA was an agent and arm of the Treasury" when it entered into the Third Amendment. February 26 Order  at 3.  Although plaintiffs group Requests 11-19 under the subtitle "Requests Relating To Whether FHFA Is The United States," the requests seek documents far beyond the scope of that category.  For example, Request 11 alone seeks "[a]ny and all documents reflecting communications between FHFA and Treasury related to the following subjects:  the decision to place the Companies into conservatorship, the terms of the [preferred stock partnership agreements (PSPAs)], amendments to the PSPAs, the practice of making draws on Treasury's funding commitment to fund dividends on the Government's Stock, the Periodic Commitment

---

[3]  We also reserve the right, if appellate relief is appropriate, to seek relief in the court of appeals.

Fees authorized by the PSPAs, and FHFA's strategic plan for the conservatorships released in

February 2012." The Government respectfully requests a protective order that relieves the

Government of any obligation to respond to requests outside the categories identified in the

Court's February 26 Order.

## ARGUMENT

### I.     Requests For Documents Relating To The Future Termination Of The Conservatorships And Future Profitability Of The Enterprises Interfere With The Operation Of The Conservatorships In Violation Of HERA And Impermissibly Intrude Into The Deliberative Process

A number of plaintiffs' requests impermissibly interfere with the operation of the

conservatorships and seek documents that are inherently deliberative and pre-decisional.

Requests 6-10, in their entirety, seek documents relating to the future "termination of the

conservatorships" of Fannie Mae and Freddie Mac:

**REQUEST NO. 6:** Any and all documents relating to the standards for determining when, whether, and how to terminate the conservatorships of the Companies, including but not limited to documents relating to Treasury's authority to prevent termination of the conservatorships by withholding consent to termination of the conservatorships.

**REQUEST NO. 7:** Any and all documents relating to Defendant's commitment to ensure that existing equity holders will not have access to positive earnings from the GSEs, including the development of this policy and actions taken pursuant to this policy. *See, e.g.*, T202.

**REQUEST NO. 8:** Any and all documents relating to Defendant's policies to reduce the Companies' role in the mortgage market and to wind the Companies down, including development of those policies and actions taken pursuant to those policies. *See, e.g.*, T207.

**REQUEST NO. 9:** Any and all documents reflecting communications between FHFA and/or Treasury, on the one hand, and the Companies' board members and executives, on the other hand, relating to termination of the conservatorships.

**REQUEST NO. 10:** Any and all documents relating to Defendant's expectation that the Companies will not continue as they existed before the conservatorships. *See, e.g.*, T2390.

In addition, Request No. 1 seeks any and all projections relating to the "profitability" of the Enterprises "from the time Defendant began considering whether to place the Companies into conservatorship to the present, including any models relating to those projections." As demonstrated below, these requests are contrary to statute and impermissibly seek documents protected by the deliberative process privilege.

A.     **Permitting The Discovery Plaintiffs Seek Would Be Contrary To HERA**

Good cause exists for a protective order barring plaintiffs from propounding these requests. *See Iris Corp. Behad v. United States*, 84 Fed. Cl. 489, 492 (2008) ("Good cause requires a showing that the discovery request is considered likely to oppress an adversary or might otherwise impose an undue burden."). The requests—which are designed to elicit information regarding when and how the conservatorship will terminate and the future profitability of the Enterprises—run headlong into the governing provisions of HERA. As the Court is aware, "Congress enacted HERA and created FHFA in response to the housing and economic crisis, precisely because it wanted to address the dire financial condition of Fannie Mae and Freddie Mac." *FHFA v. UBS Americas Inc.*, 712 F.3d 136, 138 (2d Cir. 2013). HERA "grants FHFA the power to place the Enterprises into conservatorship, and FHFA did so on September 6, 2008." *County of Sonoma v. FHFA*, 710 F.3d 987, 989 (9th Cir. 2012). Two HERA provisions protect the conservatorships from shareholder interference. As we have urged, HERA compels dismissal of plaintiffs' suit. Def.'s Mot. To Dismiss, Dec. 9, 2013 (Dkt. 20), at 21-23.

In addition, of immediate importance, HERA precludes the type of discovery proposed by plaintiffs to the extent the Requests seek documents created after August 17, 2012, the date of execution of the Third Amendment.

5

The first HERA provision of particular relevance vests FHFA, as conservator, with all of the rights of the shareholders for the duration of the conservatorships. "As conservator, FHFA succeeds to 'all rights, titles, powers, and privileges of the regulated entity, *and of any stockholder*, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity.'" *County of Sonoma*, 710 F.3d at 989 (quoting 12 U.S.C. § 4617(b)(2)(A)) (emphasis added). Accordingly, the plaintiff shareholders in this case do not have a claim for "'actual, presently due money damages from the United States'" that is the prerequisite to Tucker Act jurisdiction. *Schott v. Dep't of Transp.*, 229 Ct. Cl. 853, 854 (1982) (quoting *United States v. King*, 395 U.S. 1, 3 (1969)); *see also id.* ("Since there is … no claim that there is money presently owed [plaintiffs], we do not have jurisdiction of these suits."). Under HERA, plaintiff shareholders have no enforceable rights for the duration of the conservatorships. No discovery into when and how the conservatorships will end can alter that incontestable fact.

Plaintiffs, indeed, do not contend that they are entitled to "actual, presently due money damages from the United States;" instead, they claim that, if the Enterprises are placed in receivership and liquidated at some future point, they will then be entitled to compensation for an alleged loss of their liquidation preference. Alternatively, plaintiffs claim that they will be entitled to dividends if the Enterprises emerge from the conservatorships.

Because the Enterprises have not been placed in receivership, are not currently being liquidated, and have not emerged from conservatorship, no discovery into their projected profitability can alter that circumstance. Moreover, if the Enterprises are eventually liquidated, HERA will limit the shareholders' recovery to what they would have received had the Enterprises gone into immediate liquidation at the time FHFA placed them in conservatorship.

6

*See* 12 U.S.C. § 4617(e)(2).   HERA thus prevents plaintiffs from doing precisely what they

attempt to do through this lawsuit: recover a windfall because of the conservatorship actions of

FHFA, executed exclusively with public funds supplied by Treasury for the benefit of taxpayers.

The second HERA provision of particular relevance commands: "Except as provided in

this section or at the request of the Director, *no court may take any action to restrain or affect* the

exercise of powers or functions of the Agency as a conservator or a receiver."  12 U.S.C.

§ 4617(f) (emphasis added).  The declaration of FHFA Director Melvin Watt leaves no doubt

that judicially enforced disclosure of the information sought in the cited categories "will have

extraordinarily deleterious consequences on the Conservator's conduct of the ongoing and future

operations of the conservatorships."  Watt Decl. ¶ 3, A1-2.[4]

As Director Watt explains, "[t]he Conservator is charged with directing the largest

conservatorships in U.S. history in support of the Nation's multi-trillion dollar mortgage finance

system."  *Id*. ¶ 7, A3.  "The disclosure of any plans relating to ongoing and future operation of

the conservatorships, including the projections of the future profitability of Fannie Mae and

Freddie Mac (or lack thereof) under a range of economic, business and policy scenarios can be

anticipated to have a destabilizing effect on the Nation's housing market and economy."  *Id.*

As Director Watt notes, "[t]o discharge their missions, the Enterprises purchase

residential mortgages originated by banks and other qualified lenders," and "[t]o finance their

---

[4]  Section 4617(f) bars not only court action directed at the Conservator but also court action
directed at another party – here, Treasury – when such action is another way of effecting the
restraint against the conservator.  *See, e.g.*, *In re Fed. Home Loan Mortgage Corp. Derivative
Litig.* ("*In re Freddie Mac*"), 643 F. Supp. 2d 790, 799 (E.D. Va. 2009) ("A court action can
'affect' a conservator even if, as in the cases at bar, the litigation is not directly aimed at the
conservator itself."), *aff'd sub nom. La. Mun. Police Employees Ret. Sys. v. FHFA*, 434 F. App'x
188 (4th Cir. 2011).  Thus, the Court is similarly precluded from enforcing an order that compels
the production of such documents from Treasury.

purchases of residential mortgages, the Enterprises borrow funds from investors by issuing debt securities, and they also bundle the mortgages into mortgage-backed securities that are in turn sold to investors." *Id.* ¶ 8 (A3). "The prices at which the Enterprises can sell their debt securities and mortgage-backed securities to such investors are directly related to market perception of the Enterprises' financial viability." *Id.* "If the market perception is that the Enterprises are not financially viable, they will have greater difficulty selling their debt and mortgage-backed securities, leading to lower proceeds from such sales." *Id.* "As less capital becomes available to the Enterprises for their future operations, the Enterprises become less able to purchase mortgages from loan originators. That effect would in turn result in higher mortgage rates, reduced loan availability for homebuyers in the primary market, or both, as loan originators find it more difficult to generate capital for further lending and reduce portfolio risk by re-selling their loans in the secondary market." *Id.* at A3-4.

Director Watt explains that "[t]he disclosure of forward-looking, non-public financial projections could immediately alter market expectations and have a destabilizing impact on the housing market in both the short and long term." *Id.* ¶ 9, A4. "For example, disclosure of projections that suggested (or that market participants interpreted as suggesting) that the Enterprises' financial condition[s] were worse than previously assumed, could, through the mechanism outlined above, increase current prices in the primary and secondary mortgage markets." *Id.* "Conversely, disclosure of projections that tended to suggest that the Enterprises' financial viability w[as] enhanced relative to current market expectations, could also impact the sales of the Enterprises' debt and mortgage-backed securities, and hence the rates available in the primary and secondary markets." *Id.* "In either case, disclosure of forward-looking, non-public information could result in an array of consequences such as sharp spikes or declines in the cost

of obtaining credit for borrowers and large shifts in the demand for mortgage-backed securities."
*Id.* "This result would undermine FHFA's ability to direct the conservatorships and detract from
Congress's goal of maintaining stability in the federal housing markets." *Id.*

Summarizing, Director Watt observes that "[t]he intention of the [senior preferred stock
purchase agreements] was to instill market confidence in the Enterprises." *Id.* ¶ 10, A4.
"Disclosure of confidential information relating to ongoing and future operations of the
conservatorships, which was for internal use by FHFA, and not intended for public disclosure
and consumption, would directly undermine that goal and could induce precisely the market
instability that FHFA was created to prevent." *Id*, A4-5.; *see also* Stegman Decl. ¶ 27, A16
("Request Nos. 1, 6, 7, 8, 9 and 10 all seek disclosure of information that has the potential to
affect the U.S. markets and, by extension, the U.S. economy, in a number of ways.").

Director Watt also notes that the requested discovery could "adversely affect the
Conservator's ability to operate the conservatorships because it would enable the Enterprises to
gain access to confidential internal FHFA documents that were not intended to be shared with or
reviewed by the Enterprises."  Watt Decl. ¶ 11, A5.  As Director Watt explains, "[i]t is essential
for the Conservator to be able to restrict access to confidential agency documents that reflect
internal policy deliberations, the disclosure of which would affect the Conservator's ability to
direct the ongoing and future operations and activities of the Enterprises." *Id.*  "A contrary result
would greatly restrain the unfettered ability Congress conferred upon the Conservator to continue
to develop and implement the most effective policy solutions for the wide array of operational
and other challenges confronting the Enterprises." *Id.*

Moreover, the "[d]isclosure of documents relating to the future of the Enterprises, such as
documents responsive to document requests 6 and 8 pertaining to a possible future wind down

and termination of the conservatorships, could also severely affect employee stability at Fannie

Mae and Freddie Mac, thereby compromising critical policy matters regarding the

conservatorships." *Id.* ¶ 12, A5.  "Between late 2011 and early 2012, voluntary departures from

Freddie Mac reached 17% in the wake of different proposals to alter its compensation system."

*Id.*  "Disclosure of confidential information about the Enterprises' futures could lead to

equivalent, or greater, departure levels."  *Id.*

**B.      Deliberations Regarding The Future Of The Enterprises Are Also Protected
          By The Deliberative Process Privilege**

**1.**  By seeking documents relating to the termination of the conservatorships and the

future profitability of the Enterprises, Requests 1 and 6-10 impermissibly seek documents

protected by the deliberative process privilege.  The deliberative process privilege safeguards the

Government from disclosure of pre-decisional discussions of sensitive policy matters.  The

privilege reflects the longstanding judicial recognition that "[i]f agencies were 'to operate in a

fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative

decisions would consequently suffer.'"  *Nat'l Sec. Archive v. CIA*, _ F.3d _, 2014 WL 2053829,

*2 (D.C. Cir. May 20, 2014) (internal quotation marks and citation omitted); *see Dep't of

Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) ("The deliberative

process privilege rests on the obvious realization that officials will not communicate candidly

among themselves if each remark is a potential item of discovery and front page news, and its

object is to 'enhance the quality of agency decisions' . . .  by protecting open and frank

discussion among those who make them within the Government.") (internal citation omitted).

By protecting materials that are pre-decisional and deliberative from compelled

disclosure, and preventing the "premature disclosure of proposed policies before they have been

finally formulated or adopted," the privilege also "protect[s] against confusing the issues and

misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 866 (D.C. Cir. 1980).

"Factual information asserted to be deliberative 'should be disclosed . . . but only if it does not reveal the deliberative process and [is] not intertwined with the policy-making process.'" *In re United States,* 321 Fed. App'x 953, 959 (Fed. Cir. 2009) (citation omitted). Thus, "factual information that itself reveals the deliberative process and cannot be severed from the deliberative context is protected." *Id.* (citing *Envtl. Prot. Agency v. Mink,* 410 U.S. 73, 87–88 (1973)). Courts accordingly "'focus less on the nature of the materials sought and more on the effect of the materials' release: the key question in [such] cases became whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.'" *Id.* (quoting *Dudman Commc'ns v. Dep't of the Air Force,* 815 F.2d 1565, 1568 (D.C. Cir. 1987), and citing *Quarles v. Dep't of the Navy,* 893 F. 2d 390, 392 (D.C. Cir. 1990), for the proposition "that courts hold exempt from disclosure factual material such as factual summaries by decisionmakers or factual material about the inner workings of the deliberative process itself").

**2.** These principles require issuance of a protective order for the same categories discussed above.[5] "Request Nos. 6, 7, 8, and 9 seek documents relating to agency deliberations and the formulation of policy on the future framework of the housing finance system." Stegman Decl. ¶ 21, A13. "[D]ocuments related to the 'development' of those policies are inherently pre-decisional,"

---

[5] The deliberative process privilege is asserted here by Christopher H. Dickerson, Senior Associate Director of FHFA's Division of Enterprise Regulation, and by Dr. Michael Stegman, Counselor to the Treasury Secretary for Housing Finance Policy. The declarants have been delegated authority by their respective agency heads to assert the privilege.

and, because "[i]t is currently anticipated that Congressional action will establish the framework of the housing finance system going forward," "final decisions regarding when, whether, and how the conservatorships will be terminated have not been made," and "it is impossible to predict when or how such final decisions will be made." *Id.*, A14.  The same concerns apply to documents responsive to Request 10 (seeking "documents relating to Defendant's expectation that the [Enterprises] will not continue as they existed before the conservatorships"). *Id.* ¶ 22, A14. Likewise, Request No. 1, which calls for "[a]ny and all projections, from the time Defendant began considering whether to place the Companies into conservatorship to the present, including any models relating to those projections," seeks "spreadsheets, models, emails, presentations (including drafts), memoranda (including drafts), and assessments reflecting Treasury's ongoing, internal evaluations and assessments of the GSEs financial condition." *Id.* ¶ 20, A13.

The declaration of FHFA's Christopher H. Dickerson provides an equally sound and discerning assessment, explaining that "[i]t is presently anticipated that Congressional action will establish the framework of the structure of the housing finance system going forward.  Thus, how and when the conservatorships will be terminated remains undetermined."  Dickerson Decl. ¶ 13, A24.  Accordingly, "[t]he disclosure of information relating to deliberations, standards and other considerations regarding the future and ultimate termination of the conservatorships," documents sought by Requests and 9, "is therefore by definition pre-decisional[.]" *Id.*  Similarly, documents responsive to Request 8 ("documents relating to Defendant's policies to reduce the Companies' role in the mortgage market and to wind the Companies down") and  Request 10 (documents relating to the Government's "expectation that the Enterprises will not continue as they existed before the conservatorships") "include ongoing internal agency analyses and discussions relating to the development [of] long-term strategic initiatives [and] would therefore necessarily involve the

production of pre-decisional and deliberative documents." *Id*. ¶ 14, A24;  *see also Id*. ¶ 12, A23

(documents responsive to Request No. 1 "include analyses and projections that underlie Agency

deliberations and are necessarily pre-decisional"); Stegman Decl. ¶ 22, A15 ("[b]ecause, in

Treasury's view, the future of the conservatorships will involve Congressional action (and thus is

uncertain), discussions have evolved and continue to evolve in response to political and economic

developments."); Stegman Decl. ¶ 28, A16.

The future of the Enterprises is the subject of intense, ongoing public scrutiny by Congress,

the media, and the financial markets.  Various members of Congress have introduced bills proposing

legislative solutions for the future disposition of the Enterprises, and a variety of scenarios are under

consideration and the subject of vigorous debate.  Projections of future profitability are a crucial part

of that evolving and ongoing decision-making process.  Because that process has not yet reached its

conclusion, it is beyond dispute that any discussions and analyses regarding "when and how the

conservatorships will end" are inherently pre-decisional.

The harm caused by disclosing the information sought in these categories is manifest.

Disclosure would frustrate HERA's purpose, provide misleading information that could roil the

financial markets, and profoundly chill agency deliberations.  Mr. Dickerson notes, for example, that

"prices for mortgage-backed securities in the mortgage futures market (which are an indicator of

investor demand for mortgages) would change very quickly if information were made available

suggesting that the Enterprises would significantly alter their role in the mortgage market."

Dickerson Decl. ¶ 16, A25.  "Because mortgage rates are very sensitive to price changes in the

futures market, the disclosure of the type of non-public information contained in response to

Plaintiffs' Requests No[s.] 1 (to the extent it seeks documents relating to ongoing and future

operations of the Enterprises) 6, 7, 8, 9 and 10 would quickly result in higher costs for borrowers."

*Id.*   Indeed, "[o]ver time, the increased costs for mortgages would have significant repercussions not just for the nationwide housing market, but for the National economy as a whole."   *Id.*

Similarly, Director Watt explains that the disclosure of information "concerning a wide range of operational and other issues about which final decisions have not yet been made or implemented fully, such as documents responsive to Requests 8 and 10, would mislead the public and adversely affect market participants by disseminating raw data and information suggesting courses of action that may later be rejected or significantly altered."  Watt Decl. ¶ 13, A6.

Director Watt emphasizes that "[t]he release of documents that reflect prior thinking of Agency personnel concerning matters about which the Agency may follow a different course during my tenure as Director are likely to lead to the public and market participants second-guessing every decision," *id.*, with the consequence that "changes to Agency policy [will be made] more difficult at both the deliberation and implementation stages."  *Id.*   Dr. Stegman similarly stresses that "[d]isclosure of deliberations has the potential to result in significant misunderstanding, disruption, and confusion in the markets.  The policy decision-making process is iterative.  It involves evaluation, testing, and re-testing of ideas, options, and strategies.  Often early hypotheses, strategies, suggestions, and ideas prove to be not workable for any number of reasons."  Stegman Decl. ¶ 28, A16.  Thus, "produc[ing] deliberative materials that reflect such discarded assumptions and ideas could misinform the public and result in unintended market consequences.  Such information has the potential to influence public perception of the GSEs, which could, in turn, affect mortgage interest rates for home purchasers, and the market values of mortgage-backed securities and GSE debt securities held by investors."  *Id.*

As described in detail by Dr. Stegman, requiring disclosure of documents relating to the termination of the conservatorships and the future profitability of the Enterprises will have a

"chilling effect on the exchange of opinions and ideas" and a "profound negative impact on Treasury's ability to engage in ongoing policy deliberations." *Id*. ¶¶ 6, 30, A8-9, 17. In particular, disclosure "will impede Treasury's ability to help bring about comprehensive reform of the housing finance system." *Id*. ¶ 6, A9. Since 2010, Treasury has been actively engaged in policy development to help achieve comprehensive housing finance reform. *Id*. ¶¶ 14-15, A11-12. For example, Treasury engaged in "extensive discussions to prepare the report to Congress, titled 'Reforming America's Housing Finance Market A Report to Congress.'" *Id*. ¶ 15, A12. Additionally, "Treasury has worked closely with Congressional staff during the process of drafting bipartisan legislative proposals for housing finance reform. Senior Treasury officials have provided assistance to the Senate Banking Committee and other Congressional staff regarding some of the more complex technical issues surrounding housing finance reform." *Id*. ¶ 16, A12. Granting plaintiffs access to these materials will have a detrimental effect on the Government's ability to fully develop policies. Dr. Stegman's declaration describes in detail the harms that such disclosure will cause to the policy-making process:

- Treasury personnel "are unlikely to feel at liberty to offer their opinions" (*Id*. ¶ 23, A15);

- Other agencies "may cease communicating freely with Treasury" (*Id*. ¶ 24, A15);

- Treasury's productive engagement with Congress is likely to be impeded if "Congressional members and their staff no longer feel that they can communicate freely with Treasury" (*Id*. ¶ 26, A16);

- The suggestion of "rationales for Treasury's policies and decisions that may or may not have been relied upon as the basis for final policy positions and decisions" could cause public confusion (*Id*. ¶ 29, A16).

The impact of plaintiffs' requests would be particularly acute "because policy efforts in the area of housing finance reform are ongoing, [and] the documents covered by these requests continue to be created as an ongoing matter." *Id.* ¶ 24, A15. Because of the adverse effect resulting from such disclosures, the prospect that these pre-decisional communications might be subject to compelled release on a rolling basis would have a profound negative impact.

In short, plaintiffs' requests would require Treasury and the FHFA "to operate in a fishbowl," *Nat'l Sec. Archive v. CIA*, 2014 WL 2053829, at *2, precisely the consequence that the deliberative process privilege is intended to foreclose. Because Requests 1 and 6-10 seek documents that fall squarely within the purview of the deliberative process privilege, the Court should enter an order directing that the Government need not produce any documents, created after August 12, 2012, responsive to those requests.

**3.** Plaintiffs can demonstrate no legitimate need for the materials, let alone make the "showing of compelling need" necessary to "overcome the qualified deliberative process privilege." *Marriott Intern. Resorts, L.P. v. United States,* 437 F.3d 1302, 1307 (Fed. Cir. 2006) (citing *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir.1997)). Even under the theory propounded by plaintiffs in seeking to establish Tucker Act jurisdiction—that FHFA acted as Treasury's agent when FHFA entered into the Third Amendment—the documents sought in Requests 1 and 6-10 that were created after the date of the Third Amendment (August 17, 2012) have no bearing on their takings claim.

Moreover, these requests are not necessary to the Court's resolution of the Government's motion to dismiss. With respect to the ripeness argument, the Government's internal expectations as to "when and how the conservatorships will end" and the future profitability of the Enterprises do not bear upon the undisputed fact that the Enterprises remain in

16

conservatorship today and plaintiffs' claims are not currently ripe.  And, with respect to the

discovery ordered under the RCFC 12(b)(6) motion, it is clearly established that plaintiffs must

identify their own, subjective expectations in order to satisfy the *Penn Central* test by

demonstrating that their expectations were reasonable at the time of their investment.  *See*

*Cienega Gardens v. United States*, 503 F.3d 1266, 1288 (Fed. Cir. 2007).  Thus, the evidence of

"reasonableness of expectations" is in the plaintiffs' possession, not the Government's.[6]

    Further, the provisions of HERA, which independently warrant issuance of a protective

order, also offer clear guidance in the application of the deliberative process privilege.  HERA

underscores that it would be improper to order disclosure of pre-decisional documents that would

undermine the efficacy of the conservatorships, either by affecting market activities or by

chilling ongoing deliberations.  *See Nat'l Trust for Historic Preserv. v. FDIC*, 995 F.2d 238, 240

(D.C. Cir. 1993) (holding materially identical statutory language "immuniz[es]" the conservator

from "outside second-guessing" ), *aff'd and reinstated on reh'g*, 21 F.3d 469 (D.C. Cir. 1994);

*Nat'l Trust for Historic Preserv. v. FDIC*, 21 F.3d 469, 472 (D.C. Cir. 1994) (Wald, J.,

concurring) ("given the breadth of the statutory language . . . the statute would appear to bar a

court from acting in virtually all circumstances.").

---

[6] In fact, as set forth in their response to our first interrogatory, plaintiffs Fairholme Funds,  Inc. and Fairholme Fund (Fairholme Plaintiffs) purchased all of their holdings in the Enterprises more than eight months *after* the execution of the Third Amendment.  Fairholme Plaintiffs' Answer to Defendant's First Interrogatory, dated May 7, 2014.  In order to survive the Government's motion to dismiss, Fairholme is in the difficult position of demonstrating that the Third Amendment, which was executed and announced to the public *before* the Fairholme Plaintiffs purchased their shares in the Enterprises, had an economic impact upon them. ( In contrast to the Fairholme Plaintiffs, other plaintiffs in this suit appear (based on their interrogatory responses) to have purchased, before the Third Amendment, some shares that they continue to hold today.)

Finally, in their parallel district court lawsuit that also challenges the Third Amendment, plaintiffs already have received thousands of pages of documents regarding the respective decisions of Treasury and the FHFA to enter into the Third Amendment. *See* Administrative Record of the Department of the Treasury, *Fairholme Funds, Inc. v. FHFA*, No. 13-cv-1053 (D.D.C.) (filed Dec. 17, 2013); Document Compilation by Defendants FHFA and Edward DeMarco Regarding Third Amendment To Senior Preferred Stock Agreements, *Fairholme Funds, Inc. v. FHFA*, No. 13-cv-1053 (D.D.C.) (filed Dec. 17, 2013); *Cf. In re U.S.*, 542 Fed. App'x  at 949 (granting writ of mandamus because the plaintiff  did not "establish[] the extraordinary circumstances necessary to justify the deposition of Chairman Bernanke at all while he holds the position of Federal Reserve Board Chairman, much less to inquire into the Federal Reserve's deliberative processes or the Chairman's mental processes.").

## II.    Plaintiffs' Requests Exceed The Scope Of The February 26 Order

Plaintiffs also have failed to limit discovery to the topics and time frames identified in the February 26 Order.  We respectfully request that the Court issue a protective order barring discovery that exceeds the scope of its Order.

Here, the Court, pursuant to its February 26 Order, narrowed the scope of discovery permitted in advance of a decision on the Government's motion to dismiss.  The Order limiting discovery is consistent with the Court's recognition that discovery while a motion to dismiss is pending should be as "narrow as possible." *Lakeland Partners*, LLC *v. United States*, 88 Fed. Cl. 124, 138 (2009).  Indeed, this Court has granted the Government a protective order when the plaintiff attempted to obtain, in advance of a decision on a motion to dismiss, discovery on matters outside the boundaries of a discovery order.  *Id.* (citing *Boye v. United States*, 2008 WL

1990866 at *6 (Fed. Cl. Mar. 4, 2008) (granting partial protective order because the requested discovery exceeded the scope of an order limiting discovery to a specific jurisdictional issue)).

First, the Court authorized discovery into the solvency of the Enterprises and reasonable expectations of their future profitability at the time they were placed into conservatorships in September 2008, as well as the issue of why the Government allowed the preexisting shareholders' capital structure to remain in place in 2008.  Feb. 26 Order at 2-3.  We have agreed to produce non-privileged documents responsive to that issue, within the reasonable time period of July 1, 2008,[7] through September 30, 2008, pursuant to Requests 1 and 4.

Notwithstanding the narrow time frame of the issue upon which the Court permitted discovery, however, Request 1 seeks 11 categories of projections as to profitability "from the time Defendant began considering whether to place the Companies into conservatorship to the present[.]"  In other words, plaintiffs seek production of six years of documents related to the financial condition of Fannie Mae and Freddie Mac.  Clearly, any documents created after the conservatorship decision are irrelevant to profitability expectations at the time of the conservatorship.

Second, a number of plaintiffs' document requests that purport to relate to the subject of profitability expectations in September 2008 do no such thing.  Requests 2 and 3, for example, seek documents related to terms of the stock agreements entered into by Treasury and FHFA. Similarly, Request 5 seeks documents related to dividends paid under the stock agreements, dividends that were paid months and years after the appointment of a conservator in September

---

[7]  Congress enacted HERA in July 2008.

2008.  Because plaintiffs' requests are beyond any reasonable reading of the Court's February 26

Order, they should be barred.

The Court also authorized discovery related to whether FHFA acted as the United States

for purposes of the Tucker Act when it entered into the Third Amendment.  Under the Court's

reasoning,  jurisdiction requires a showing that "FHFA was an agent and arm of the Treasury."

February 26 Order  at 3.  We agreed to produce responsive, non-privileged documents on that

issue in response to Request 14, which requests "[a]ny and all documents relating to the decision

to leave the [Enterprises] existing capital structure in place during the conservatorships."  The

remainder of the requests that plaintiffs group under the subtitle "Requests Relating To Whether

FHFA Is The United States," however, vastly exceed the scope of that category:

**REQUEST NO. 11:** Any and all documents reflecting communications between FHFA
and Treasury relating to the following subjects: the decision to place the Companies in
conservatorship, the terms of the PSPAs, amendments to the PSPAs, the practice of making
draws on Treasury's funding commitment to fund dividends on Government Stock, the Periodic
Commitment Fees authorized by the PSPAs, and FHFA's strategic plan for the conservatorships
released in February 2012.

**REQUEST NO. 12:** Any and all documents relating to whether and under what
circumstances the Companies could buy back the Government Stock or otherwise reduce the size
of the Government Stock's liquidation preference.

**REQUEST NO. 13:** Any and all documents relating to FHFA's determination that it is
obligated to maximize Treasury's return on its investment in the Companies or otherwise
prioritize the interests of taxpayers. See, e.g., T2376.

**REQUEST NO. 15:** Any and all documents reflecting communications between
Treasury and the Justice Department relating to the Net Worth Sweep. See, e.g., T4332.

**REQUEST NO. 16:** Any and all documents relating to the considerations Defendant
took into account when it imposed the Net Worth Sweep and the purposes of the Net Worth
Sweep, including: . . .

**REQUEST NO. 17:** Any and all documents reflecting communications relating to the Net Worth Sweep between FHFA and/or Treasury, and:
a. Fannie and Freddie Boards of Directors and Executives;
b. The Companies' lawyers;
c. The Companies' auditors;
d. Rating agencies or other market analysts.

**REQUEST NO. 18:** Any and all documents reflecting communications between members of the Federal Housing Finance Oversight Board (FHFA Director, Treasury Secretary, HUD Secretary, and SEC Chair) or their staffs, or any other person acting at their direction, relating to the imposition of the Net Worth Sweep.

**REQUEST NO. 19:** Any and all documents relating to the steps the United States has taken to ensure that potentially relevant evidence is not destroyed during the pendency of this action.

On their face, these requests go well beyond the relationship between FHFA and Treasury, and well beyond the time frame of the core issue in this case, the August 2012 Third Amendment to the stock agreements. In making these requests, plaintiffs seek to convert the limited discovery authorized by the Court into general discovery with regard to the theories they have advanced in support of their claims. We respectfully request that the Court limit plaintiffs' document requests to the issue identified in its February 26 Order, (i.e., whether FHFA "was an agent and arm of the Treasury") and confine discovery to the time period around the execution of the Third Amendment. A reasonable time period is January 1, 2012 through September 30, 2012.

## CONCLUSION

For the foregoing reasons, the Court should issue a protective order that discharges the Government of any obligation to produce documents created after August 17, 2012, the date of the Third Amendment, in response to Requests 1 and 6-10. In addition, the Court should issue a

protective order that discharges the government of any obligation to respond to the remaining

document requests to the extent that these requests exceed the scope of the February 26 Order.

Respectfully submitted,


STUART F. DELERY
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

/s/ Kenneth M. Dintzer
 by Robert E. Kirschman, Jr.
KENNETH M. DINTZER
Acting Deputy Director
GREGG M. SCHWIND
Senior Trial Counsel
ELIZABETH M. HOSFORD
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0385
Facsimile:  (202) 307-0972
Email:      KDintzer@CIV.USDOJ.GOV

Attorneys for Defendant


May 30, 2014

# APPENDIX

## <u>INDEX TO APPENDIX</u>

<u>PAGE(S)</u>

Declaration of Melvin L. Watt ................................................................................................. A1

Declaration of Dr. Michael A. Stegman ..................................................................................... A8

Declaration of Christopher H. Dickerson ................................................................................ A20

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FAIRHOLME FUNDS, INC., *et al.*,          )
                                          )
          Plaintiffs,                     )
                                          )          No. 13-465C
          v.                              )          (Judge Sweeney)
                                          )
THE UNITED STATES,                        )
                                          )
          Defendant.                      )

### DECLARATION OF MELVIN L. WATT

I, Melvin L. Watt, hereby declare, based on personal knowledge and/or information and belief as follows:

1.      I am Director of the Federal Housing Finance Agency ("FHFA" or the "Conservator") and assumed office on January 6, 2014. Prior to assuming office as Director, I served as an elected Member of the United States House of Representatives from January 1993 until January 2014.

2.      FHFA is an independent federal agency with regulatory authority over the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together, the "Enterprises") and the 12 Federal Home Loan Banks. Congress created FHFA in July 2008 in response to the housing and economic crisis with the goal of stabilizing the Enterprises and the national housing market. FHFA has served as the Conservator of the Enterprises since September 6, 2008.

3.      I have reviewed Plaintiffs' Requests for Production. I have also reviewed the Declaration of Christopher H. Dickerson that will be contemporaneously filed in this case, and I share the concerns expressed about the potential disclosure of predecisional documents plaintiffs seek relating to ongoing and future operations of the conservatorships. The purpose of this

declaration is to set forth some of the significant ways in which Plaintiffs' discovery requests

pursuant to the Court's February 26, 2014 Order would adversely impact the ability of FHFA to

exercise its powers and functions as Conservator and adversely impact the financial markets.

The disclosure of the information requested will have extraordinarily deleterious consequences

on the Conservator's conduct of the ongoing and future operations of the conservatorships.

     4.      In my role as Director, I am responsible for making policy decisions on behalf of

the Agency. As such, I am frequently involved in confidential internal deliberations regarding a

wide range of policy matters relating to the management, supervision, operation and function of

the Enterprises. These deliberations, which frequently concern how the conservatorships should

proceed on a wide variety of fronts, embody issues at the heart of the Conservator's

congressionally-defined missions.

     5.      I am aware that Plaintiffs' claims and allegations in this case challenge the Third

Amendment to the Preferred Senior Stock Agreements ("PSPAs") between FHFA. on behalf of

the Enterprises, and the U.S. Department of the Treasury. I am also aware of this Court's

February 26, 2014 Discovery Order, and that on April 7, 2014 Plaintiffs served their First Set of

Requests for Production.

     6.      Plaintiffs' discovery plan -- through document requests, interrogatories and

deposing Agency officials -- seeks to obtain confidential, non-public information concerning a

range of critical issues such as potential courses of action regarding the future of the

conservatorships that relate directly to the Conservator's ongoing mission. Specifically,

Plaintiffs' document requests 1 [to the extent it seeks documents relating to ongoing and future

operations of the Enterprises], 6, 7, 8, 9 and 10 each seeks information that relates to ongoing or

future conservatorship operations. The disclosure of such information, including information

2

A2

relating to or considered in connection with past conservatorship decisions or relevant to the Conservator's conduct of the ongoing and future operations of the conservatorships, will affect the exercise of powers or functions of the Conservator in a number of ways.

7.     The Conservator is charged with directing the largest conservatorships in U.S. history in support of the Nation's multi-trillion dollar mortgage finance system. The disclosure of any plans relating to ongoing and future operation of the conservatorships, including the projections of the future profitability of Fannie Mae and Freddie Mac (or lack thereof) under a range of economic, business and policy scenarios, can be anticipated to have a destabilizing effect on the Nation's housing market and economy.

8.     The Enterprises provide critical liquidity to the national housing finance system. To discharge their missions, the Enterprises purchase residential mortgages originated by banks and other qualified lenders, which in turn use the proceeds from those sales to engage in further lending to homebuyers in the primary mortgage market. To finance their purchases of residential mortgages, the Enterprises borrow funds from investors by issuing debt securities, and they also bundle the mortgages into mortgage-backed securities that are in turn sold to investors. The prices at which the Enterprises can sell their debt securities and mortgage-backed securities to such investors are directly related to market perceptions of the Enterprises' financial viability. If the market perception is that the Enterprises are not financially viable, they will have greater difficulty selling their debt and mortgage-backed securities, leading to lower proceeds from such sales. As less capital becomes available to the Enterprises for their future operations, the Enterprises become less able to purchase mortgages from loan originators. That effect would in turn result in higher mortgage rates, reduced loan availability for homebuyers in the primary

market, or both, as loan originators find it more difficult to generate capital for further lending and reduce portfolio risk by re-selling their loans in the secondary market.

9.      The disclosure of forward-looking, non-public financial projections could immediately alter market expectations and have a destabilizing impact on the housing market in both the short and long term.  For example, disclosure of projections that suggested (or that market participants interpreted as suggesting) that the Enterprises' financial conditions were worse than previously assumed could, through the mechanism outlined above, increase current prices in the primary and secondary mortgage markets.  Conversely, disclosure of projections that tended to suggest that the Enterprises' financial viability were enhanced relative to current market expectations could also impact the sales of the Enterprises' debt and mortgage-backed securities, and hence the rates available in the primary and secondary markets.  In either case, disclosure of forward-looking, non-public information could result in an array of consequences such as sharp spikes or declines in the cost of obtaining credit for borrowers and large shifts in the demand for mortgage-backed securities.  This result would undermine FHFA's ability to direct the conservatorships and detract from Congress's goal of maintaining stability in the federal housing markets.  In sum, making available potentially market-moving information regarding projections of future profitability (responsive to document request 1) of the Enterprises, as well as how the conservatorships may end (responsive to document requests 6, 7, 8, 9 and 10), easily could set off a chain of volatile and unpredictable reactions in the financial markets that could not be contained.

10.      The intention of the PSPAs was to instill market confidence in the Enterprises. Disclosure of confidential information relating to ongoing and future operations of the conservatorships, which was for internal use by FHFA, and not intended for public disclosure

and consumption, would directly undermine that goal and could induce precisely the market instability that FHFA was created to prevent.

11.    Making available in this litigation the type of non-public and confidential information relating to the Conservator's conduct of the ongoing and future operations of the conservatorships could also adversely affect the Conservator's ability to operate the conservatorships because it would enable the Enterprises to gain access to confidential internal FHFA documents that were not intended to be shared with or reviewed by the Enterprises. It is essential for the Conservator to be able to restrict access to confidential agency documents that reflect internal policy deliberations, the disclosure of which would affect the Conservator's ability to direct the ongoing and future operations and activities of the Enterprises. A contrary result would greatly restrain the unfettered ability Congress conferred upon the Conservator to continue to develop and implement the most effective policy solutions for the wide array of operational and other challenges confronting the Enterprises.

12.    Disclosure of documents relating to the future of the Enterprises, such as documents responsive to document requests 6 and 8 pertaining to a possible future wind down and termination of the conservatorships, could also severely affect employee stability at Fannie Mae and Freddie Mac, thereby compromising critical policy matters regarding the conservatorships. Between late 2011 and early 2012, voluntary departures from Freddie Mac reached 17% in the wake of different proposals to alter its compensation system. Disclosure of confidential information about the Enterprises' futures could lead to equivalent, or greater, departure levels.

13.    Disclosure of information sought by Plaintiffs concerning a wide range of operational and other issues about which final decisions have not yet been made or implemented

fully, such as documents responsive to requests 8 and 10, would mislead the public and adversely affect market participants by disseminating raw data and information suggesting courses of action that may later be rejected or significantly altered. This would be extremely damaging because of the critical policy matters regarding the conservatorships currently under examination and evaluation. The release of documents that reflect prior thinking of Agency personnel concerning matters about which the Agency may follow a different course during my tenure as Director are likely to lead to the public and market participants second-guessing every decision, and will make any changes to Agency policy more difficult at both the deliberation and implementation stages. Thus, the disclosure of such documents and information would substantially impair my ability to direct the operations of the conservatorships in the manner I believe to be in the best interests of the conservatorships and the Agency. Accordingly, disclosure of deliberations of my immediate predecessor and during my tenure could have adverse impact to the Enterprises and market consequences.

14. In summary, any disclosure of information concerning the Conservator's future financial projections, strategic analyses, operational plans, and a broad range of related information responsive to requests 1, 6, 7, 8, 9 and 10 that relate to the Conservator's conduct of the ongoing and future operations of the conservatorships would affect the Conservator's ability to direct the Enterprises. Likewise, the potential negative impact on the Enterprises' financial health from disclosure of such confidential , nonpublic information would undermine the Conservator's ability to conserve and preserve the assets and property of the Enterprises and maintain stability in the housing finance market.

6

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 2ŀᵗᵈ day of _____May_____ 2014 at Washington, D.C.

By: _____

MELVIN L. WATT

7

A7

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| FAIRHOLME FUNDS, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 13-465C |
| v. | ) | (Judge Sweeney) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF DR. MICHAEL A. STEGMAN**

I, Dr. Michael A. Stegman, declare as follows:

1.      I am Counselor to the Treasury Secretary for Housing Finance Policy.  I have held this position at the U.S. Department of the Treasury ("Treasury") since January 3, 2012.  I am responsible for coordinating Treasury's activities relating to the development of housing finance policy, and for assisting in the implementation of Treasury's housing programs.  I chair a steering committee composed of the senior Treasury participants in these areas.  I coordinate Treasury's work in these areas with other agencies and offices within the Executive Branch, in particular with the Department of Housing and Urban Development ("HUD"), the National Economic Council, and the Domestic Policy Council.  I am also responsible for coordinating Treasury's internal and external communications on housing finance reform.  In my position at Treasury, I have been substantively engaged in housing policy and housing finance reform.

2.      Prior to joining Treasury, I served as Director of Policy and Housing for the Program on Human and Community Development at the John D. and Catherine T. MacArthur Foundation.  Prior to joining the Foundation, I was the MacRae Professor of Public Policy, Planning, and Business at the University of North Carolina at Chapel Hill, Chairman of the Department of Public Policy, and founding director of the Center for Community Capitalism.  I

1

have served as a consultant to Treasury, the Community Development Financial Institutions Fund, and the U.S. General Accounting Office (now named the Government Accountability Office). From 1993-1997, I served as the Assistant Secretary for Policy Development and Research at HUD.

3.      The statements contained in this declaration are made to the best of my knowledge and belief, and are based upon my personal knowledge and information made available to me in the course of performing my official duties.

4.      Pursuant to Treasury Order 101-05, "the Under Secretaries . . . are authorized to perform any functions the Secretary is authorized to perform. . . ." In a memorandum dated May 29, 2014, the Deputy Secretary of the Treasury delegated to me for the purposes of this litigation, the authority to invoke the deliberative process privilege. I therefore possess delegated authority to assert the deliberative process privilege on behalf of Treasury with respect to documents and information subject to discovery requests in this lawsuit. A true and correct copy of the memorandum is attached hereto as Exhibit A.

5.      I have reviewed a subset of the documents that could be covered by the vague, broad, and ambiguous requests for production, and it is clear a number of plaintiffs' document requests involve solely the production of pre-decisional and deliberative materials. Treasury invokes the deliberative process privilege for documents responsive to Requests for Production Nos. 1, 6, 7, 8, 9, and 10.

6.      A court order requiring such documents be disclosed would immediately have a chilling effect on the exchange of opinions and ideas between Treasury staff and senior officials as well as between Treasury officials and officials and staff from other government agencies. The purpose of this declaration is to describe some of the important ways in which the discovery

2

A9

sought by plaintiffs will have an adverse effect on Treasury's ability to develop policy and will

impede Treasury's ability to help bring about comprehensive reform of the housing finance

system.

### Treasury's Role in the GSE Rescue

7.      Treasury is the executive agency that acts as the steward of the U.S. economy.

Maintaining a strong economy and creating economic and job opportunities by promoting

conditions that enable economic growth and stability at home and abroad are part of Treasury's

mission.

8.      Throughout the first half of 2008, Federal National Mortgage Association

("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac")

(collectively, "GSEs") suffered multi-billion dollar losses on their mortgage portfolios and

guarantees.  By late summer 2008, the GSEs faced severe capital shortfalls, and investors

questioned their ability to raise capital to offset credit and market losses.

9.      On September 6, 2008, the Federal Housing Finance Agency ("FHFA"), as the

regulator of the GSEs, exercised the power that Congress had granted to it in the Housing and

Economic Recovery Act of 2008 ("HERA") to place the GSEs into conservatorship.  FHFA, as

conservator, then entered into senior preferred stock purchase agreements ("PSPAs") with

Treasury whereby Treasury committed taxpayer funds to the GSEs in exchange for senior

preferred stock and additional economic rights.

10.      Initially, Treasury's commitment was capped at $100 billion for each GSE.  In

May 2009 and December 2009, FHFA, as conservator, and Treasury amended the PSPAs to

increase Treasury's commitment for each GSE due to the unprecedented losses the GSEs

suffered.

3

11.     These losses resulted in the GSEs drawing over $187 billion from Treasury to prevent mandatory receivership—approximately $116.1 billion for Fannie Mae and $71.3 billion for Freddie Mac. As of December 31, 2012, the remaining funding available from Treasury became fixed at approximately $117.6 billion for Fannie Mae and $140.5 billion for Freddie Mac.

12.     On August 17, 2012, FHFA, as conservator, and Treasury agreed to modify the terms of the PSPAs, in light of the cap that was set to go into effect at the end of 2012. That amendment (the "Third Amendment") made several changes to the original agreements to reduce the risk profile of the GSEs, and, by extension, the risk of future losses that the taxpayers faced.

13.     Today, the GSEs remain in conservatorship and their future has not been determined. It is impossible to predict when or how such final decisions will be made. Treasury believes that the end to the conservatorships will involve Congressional action.

### Treasury's Efforts Toward Housing Finance Reform

14.     Treasury has been actively engaged in efforts aimed toward achieving comprehensive housing finance reform. The flawed system of housing finance that contributed to the financial crisis is still substantially in place. The current system continues to put the taxpayer at risk, and we believe that now is the time to reform the system.

15.     To further this goal, senior Treasury officials and staff have been continuously deliberating among themselves and with officials and staff from other government agencies to develop policies for reforming the existing Fannie Mae and Freddie Mac-centered housing finance system since 2010. Senior Treasury officials and staff have been engaging with their counterparts at other government agencies to discuss and further develop policy proposals. For example, Treasury engaged in extensive discussions to prepare the report to Congress, titled

4

"Reforming America's Housing Finance Market A Report to Congress." This work marked the beginning of a multi-year policy development process that is ongoing.

16.     It is currently anticipated that Congressional action will establish the framework of the housing finance system going forward. Treasury has worked closely with Congressional staff during the process of drafting bipartisan legislative proposals for housing finance reform. Senior Treasury officials have provided assistance to the Senate Banking Committee and other Congressional staff regarding some of the more complex technical issues surrounding housing finance reform.

17.     We believe that this productive engagement is critical to putting in place a permanent, durable housing finance system. Our intensive efforts to formulate policy in support of effective housing finance reform have been ongoing since 2010.

18.     I am aware of the Court's order dated February 26, 2014, where this Court authorized Plaintiff to take discovery regarding: (1) Fannie and Freddie's solvency and the expectations about the future profitability of Fannie Mae and Freddie Mac at the time of the appointment of a conservator in September 2008; (2) whether FHFA "acted at the direct behest" of Treasury in executing the August 2012 Third Amendment to the PSPAs; and (3) the Government's current assessment of the future profitability of Fannie Mae and Freddie Mac and when and how the conservatorships will end.

19.     I have reviewed the plaintiffs' first set of document requests dated April 7, 2014. The requests demonstrate that the plaintiffs intend to seek extensive discovery on topics that extend far beyond the scope of the plaintiffs' claims related to the Third Amendment. Many of plaintiffs' requests seek material at the heart of the current and ongoing policy deliberations regarding housing finance reform.

5

20.    Request No. 1 seeks "[a]ny and all projections, from the time Defendant began considering whether to place the Companies into conservatorship to the present, including any models relating to those projections . . . " My understanding is that the documents that might be covered by the above request include spreadsheets, models, emails, presentations (including drafts), memoranda (including drafts), and assessments reflecting Treasury's ongoing, internal evaluations and assessments of the GSEs' financial condition. I have reviewed certain documents covered by this request, and have determined that the documents I have reviewed – and others that are expected to be covered by the request – reflect Treasury discussions and deliberations. Many of the documents sought by this request are preliminary, interim, and/or non-final.

21.    Request Nos. 6, 7, 8, and 9 seek documents relating to agency deliberations and the formulation of policy on the future framework of the housing finance system. Specifically, these requests seek:

     a.  any and all documents relating to the standards for determining when, whether, and how to terminate the conservatorships . . . including but not limited to documents relating to Treasury's authority to prevent termination of the conservatorships by withholding consent to termination of the conservatorships (Request No. 6);

     b.  any and all documents relating to Defendant's commitment to ensure that existing equity holders will not have access to positive earnings from the GSEs, including the development of this policy and actions taken pursuant to this policy (Request No. 7);

     c.  any and all documents relating to Defendant's policies to reduce the [GSEs] role in the mortgage market and to wind the [GSEs] down, including development of those policies and actions taken pursuant to those policies (Request No. 8);

     d.  any and all documents reflecting communications between FHFA and/or Treasury, on the one hand, and the Companies' board members and executives, on the other hand, relating to termination of the conservatorships (Request No. 9).

6

A13

My understanding is that the documents that might be covered by these requests include emails, presentations (including drafts), memoranda (including drafts), assessments, recommendations, and questions and answers prepared for senior officials (including drafts). I have reviewed certain documents covered by this request, and have determined that the documents I have reviewed – and others that are expected to be covered by the request – reflect Treasury discussions and deliberations. Preliminary opinions, recommendations, and analyses in these documents may or may not have been taken into account in developing, or formed the bases for, any of the policies or activities described in these requests. Moreover, documents related to the "development" of those policies are inherently pre-decisional. It is currently anticipated that Congressional action will establish the framework of the housing finance system going forward. Thus, final decisions regarding when, whether, and how the conservatorships will be terminated have not been made. In addition, it is impossible to predict when or how such final decisions will be made. Consequently, documents responsive to Request Nos. 6, 7, 8, and 9 would reflect pre-decisional deliberations central to the policy-making process and the considerations made by Treasury officials and staff in connection with these deliberations.

22.    Request No. 10 seeks "[a]ny and all documents relating to Defendant's expectation that the [GSEs] will not continue as they existed before the conservatorships."   My understanding is that the documents that might be covered by these requests include emails, presentations (including drafts), memoranda (including drafts), assessments, recommendations, and questions and answers prepared for senior officials (including drafts). I have reviewed certain documents covered by this request, and have determined that the documents I have reviewed – and others that are expected to be covered by the request – reflect Treasury discussions and deliberations. Preliminary opinions, recommendations, and analyses in these

7

documents may or may not have been taken into account in developing, or formed the bases for, any of the objectives or strategies that Treasury subsequently adopted. Because, in Treasury's view, the future of the conservatorships will involve Congressional action (and thus is uncertain), discussions have evolved and continue to evolve in response to political and economic developments. For example, over the last several weeks, expectations regarding the future of the GSEs have changed frequently as the Senate Banking Committee has been considering and voting on draft legislation. Further, any expressions of expectations contained in responsive documents do not necessarily represent the expectations of the U.S. government or of Treasury.

23.     If Treasury personnel are told that their deliberations will become public instead of only their final policy decisions, they are unlikely to feel at liberty to offer their opinions. Relatedly, if Treasury personnel are told that they cannot put their ideas, suggestions, opinions, and recommendations in writing without those writings being disclosed, it will immediately become difficult to fully develop policies and strategies.

24.     Indeed, because policy efforts in the area of housing finance reform are ongoing, the documents covered by these requests continue to be created as an ongoing matter. If other agencies feel that they cannot share information with Treasury without it being subject to disclosure in the future, they may cease communicating freely with Treasury.

25.     As described above, the near-constant work on housing finance reform over the last several years has created a huge volume of documents that are covered by plaintiffs' requests. Based on the documents that I have reviewed and my reading of the plaintiffs' discovery requests, I am confident that many of the documents requested by plaintiffs contain the type of pre-decisional and deliberative information described above.

8

26.     Moreover, discovery on these topics is also likely to impede the productive engagement that Treasury staff has had with Congress as it seeks to bring about a legislative solution. This policy-making process will be at risk if Congressional members and their staff no longer feel that they can communicate freely with Treasury.

27.     Apart from calling for documents that are necessarily deliberative and pre-decisional in nature, Request Nos. 1, 6, 7, 8, 9 and 10 all seek disclosure of information that has the potential to affect the U.S. markets and, by extension, the U.S. economy, in a number of ways.

28.     Disclosure of deliberations has the potential to result in significant misunderstanding, disruption, and confusion in the markets. The policy decision-making process is iterative. It involves evaluation, testing, and re-testing of ideas, options, and strategies. Often early hypotheses, strategies, suggestions, and ideas prove to be not workable for any number of reasons. Being required to produce deliberative materials that reflect such discarded assumptions and ideas could misinform the public and result in unintended market consequences. Such information has the potential to influence public perception of the GSEs, which could, in turn, affect mortgage interest rates for home purchasers, and the market values of mortgage-backed securities and GSE debt securities held by investors.

29.     In addition, disclosure of views or opinions of individual Treasury officials may suggest rationales for Treasury's policies and decisions that may or may not have been relied upon as the basis for final policy positions and decisions. Requiring premature disclosure of proposed policies could also cause confusion by leading the public to believe that a certain policy has been adopted or will be adopted when, in fact, it might not be adopted at all.

9

30.     The risk associated with being required to disclose pre-decisional, deliberative documents is especially acute in this context, because housing finance reform is subject to immense public interest and scrutiny.  Requiring disclosure of the details of this evolving policy-making process before any final decisions have been made will have a profound negative impact on Treasury's ability to engage in ongoing policy deliberations.  As Treasury continues its efforts to help bring about comprehensive reform of the housing finance system, it is critical that we preserve the ability to have robust discussions in which we are able to explore sensitive and important policy decisions from multiple angles.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 29, 2014, in Washington, DC.

Dr. Michael A. Stegman
Counselor to the Secretary of the Treasury
for Housing Finance Policy
Department of the Treasury

10

A17

# Exhibit A



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

May 29, 2014

**MEMORANDUM FOR MICHAEL STEGMAN, COUNSELOR TO THE TREASURY
SECRETARY FOR HOUSING FINANCE POLICY**

**FROM:**          Sarah Bloom Raskin
                   Deputy Secretary of the Treasury

**SUBJECT:**       Delegation of Authority to Invoke the Deliberative Process Privilege:
                   *Fairholme Funds, Inc. v. United States*

This memorandum delegates my authority to invoke the deliberative process privilege to the
Counselor to the Treasury Secretary for Housing Finance Policy with respect to documents and
information at issue in *Fairholme Funds, Inc. v. United States*, No. 13-465C (Fed. Cl.).

The Counselor to the Treasury Secretary for Housing Finance Policy may exercise this delegated
authority with respect to agency records or information that are predecisional and deliberative,
including advisory opinions, recommendations, and deliberations that comprise part of the
process by which Treasury Department decisions and policies are formulated, when he
determines that the release of such records would cause unacceptable harm to that process.

This authority may not be re-delegated.

A19

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FAIRHOLME FUNDS, INC., *et al.*,    )
    )
        Plaintiffs,    )
    )   No. 13-465C
    v.    )   (Judge Sweeney)
    )
THE UNITED STATES,    )
    )
        Defendant.    )

## DECLARATION OF CHRISTOPHER H. DICKERSON

I, Christopher H. Dickerson, hereby declare, based on personal knowledge of the facts, as follows:

1.    I am the Senior Associate Director, Division of Enterprise Regulation at the Federal Housing Finance Agency ("FHFA"). Previously, I was Deputy Director, Division of Enterprise Regulation at FHFA. FHFA is an independent federal agency with regulatory authority over the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together, the "Enterprises") and the Federal Home Loan Banks.

2.    For the purposes of this litigation, I have been delegated the authority by FHFA Director Melvin L. Watt to invoke the deliberative process privilege. I therefore possess delegated authority to assert the deliberative process privilege on behalf of FHFA with respect to documents and information subject to discovery requests in this lawsuit. A true and correct copy of the delegation memorandum is attached hereto as Exhibit A.

3.    As Senior Associate Director, Division of Enterprise Regulation, I am involved in confidential internal deliberations regarding operational, policy and regulatory matters relating to

the supervision of the Enterprises. These deliberations concern the operation and the future of the conservatorships and reflect judgments and decisions that Congress has entrusted to FHFA.

4.     The purpose of this declaration is to set forth some of the significant ways in which Plaintiffs' discovery requests pursuant to the Court's February 26, 2014 order authorizing discovery into the Conservator's conduct of the ongoing and future operations of Fannie Mae and Freddie Mac, including discovery into FHFA's "assessment of [their] future profitability" and to "answer the question as to when, and how, the conservatorship will end," necessarily require the production of pre-decisional and deliberative documents from FHFA and will adversely impact the financial markets.

5.     On September 6, 2008, FHFA's Director appointed FHFA as Conservator of the Enterprises. Among the broad goals of the conservatorships are to help restore confidence in the Enterprises and avoid the systemic risk that can directly destabilize the national housing finance market. As Conservator, FHFA focuses on improving the Enterprises' operational efficiency and effectiveness, promoting and maintaining foreclosure prevention efforts and credit availability for new and refinanced mortgages and building infrastructure for future mortgage finance markets. The strategic plan for the conservatorships issued on May 13, 2014 describes the broad-range of issues on which the Conservator is focusing its direction of the Enterprises. To achieve the policy goals discussed above, Congress provided FHFA with a broad array of tools and authorities to enable the Conservator to take the steps it determines are necessary to carry out its functions.

6.     FHFA is a small government Agency, with approximately six hundred employees, only a portion of whom work on issues relating to the conservatorships. The Enterprises, with assets in excess of $5 trillion and a combined 12,000 employees, are among the largest financial

2

institutions in the world.  Because resources are limited, it is important that Agency personnel be able to execute the critical missions of the conservatorships insulated from interference of outside parties.  In fact, Congress provided that the Conservator is statutorily immune from direction and supervision of any other federal agency and from State intrusions.  Nor may any court take any action to restrain or affect the exercise of the Conservator's powers and functions. Finally, any rights of shareholders, officers, and the board of directors have been expressly given by Congress to the Conservator so that various stakeholders may not impede the Conservator's functions or operations.

7.      As permitted by the Housing and Economic Recovery Act of 2008 ("HERA"), on September 7, 2008, FHFA, as Conservator of the Enterprises, entered into two materially identical Senior Preferred Stock Purchase Agreements ("PSPAs") with the Department of Treasury—one for Fannie Mae and one for Freddie Mac.  The purpose of the PSPAs was to ensure that the net worth of each Enterprise was not negative, thereby avoiding mandatory statutory receivership.  The Conservator is authorized to draw on the Preferred Stock Agreements at the end of each fiscal quarter to make up any deficiency in either Enterprise's net worth that otherwise would mandate the placement of such Enterprise into receivership.  To date, the Conservator has drawn on behalf of the Enterprises over $187 billion from Treasury—$116.1 billion for Fannie Mae, and $71.3 billion for Freddie Mac.  As of December 31, 2012, the remaining funding available from Treasury became fixed at $117.6 billion for Fannie Mae and $140.5 billion for Freddie Mac.

8.      To preserve and conserve this fixed remaining funding, FHFA and Treasury executed a Third Amendment to the PSPAs that added a quarterly variable dividend in the

3

amount of each Enterprise's net worth to replace the Periodic Commitment Fee and fixed 10% dividend.

9.      I am aware that Plaintiffs' claims and allegations in this case challenge the Third Amendment to the PSPAs.

10.     On February 26, 2014, this Court authorized Plaintiff to take discovery regarding: (1) the Government's assessment of the future profitability of Fannie Mae and Freddie Mac at the time of the appointment of a conservator in September 2008; (2) whether FHFA "acted at the direct behest" of Treasury in executing the August 2012 Third Amendment to the PSPAs; and (3) the Government's current assessment of the future profitability of Fannie Mae and Freddie Mac and when and how the conservatorships will end.

11.     I have reviewed the First Set of Requests for Production that Plaintiffs served on April 7, 2014. A number of Plaintiffs' document requests will involve *solely* the production of pre-decisional and deliberative material. Pursuant to the Director's delegation, FHFA hereby invokes the deliberative process privilege for documents responsive to Requests for Production No's. 1 (to the extent it seeks documents relating to ongoing and future operations of the Enterprises) 6, 7, 8, 9 and 10.

12.     Several of the subcategories of documents included within Plaintiffs' First Request will contain information that relates to the ongoing and future operations of the Enterprises. For example, Request for Production 1(i) requests "all documents relating to the impact that guarantee fee increases would have on the Companies' revenues." Documents responsive to this request include analyses and projections that underlie Agency deliberations and are necessarily pre-decisional. Likewise, Request 1(d) calls for "projections prepared by the Companies and the assumptions, models, data, and analyses relating to those evaluations" and

4

would include forward-looking, deliberative and non-public information. As we discuss below, disclosure of non-public, confidential, pre-decisional pricing documents will impede the ability of FHFA to operate and supervise the Enterprises.

13.     In Plaintiffs' own words, Requests for Production No's 6-10 seek information "Relating to Termination of Conservatorships," a category of materials that will necessarily involve the ongoing and future operations of the Enterprises. For example, Request for Production No. 6 calls for "all documents relating to the standards for determining when, whether, and how to terminate the conservatorships of the [Enterprises]." Request No. 9 calls for "all documents reflecting communications between FHFA and/or Treasury, on the one hand, and the Companies' board members and executives, on the other hand, relating to termination of the conservatorships." It is presently anticipated that Congressional action will establish the framework of the structure of the housing finance system going forward. Thus, how and when the conservatorships will be terminated remains undetermined. The disclosure of information relating to deliberations, standards and other considerations regarding the future and ultimate termination of the conservatorships is therefore by definition pre-decisional and documents responsive to document requests 6 and 9 will be covered by the deliberative process privilege.

14.     Likewise, Request for Production No. 8 calls for all "documents relating to Defendant's policies to reduce the Companies' role in the mortgage market and to wind the Companies down." Request No. 10 calls for all documents relating to the Government's "expectation that the Enterprises will not continue as they existed before the conservatorships." Documents responsive to these requests include ongoing internal agency analyses and discussions relating to the development long-term strategic initiatives would therefore necessarily involve the production of pre-decisional and deliberative documents.

5

15.     Besides containing documents that are necessarily deliberative and pre-decisional in nature, Requests No.'s 1 (to the extent it seeks documents relating to ongoing and future operations of the Enterprises) 6, 7, 8, 9 and 10 all seek information that, if made available, would threaten the Nation's housing market.

16.     Fannie Mae and Freddie Mac serve the critical function of expanding home ownership to Americans by supplying capital and liquidity in the market for residential mortgages. The Enterprises purchase mortgages from originating lenders and either hold them in their own portfolios, or pool the mortgages and sell mortgage-backed securities to investors. The additional capital and liquidity provided by the Enterprises to private lenders frees up banks' limited capital, allowing them to make more loans. The disclosure of confidential, non-public information such as projections of future profitability is plainly relevant to investor perceptions of the financial health of Fannie Mae and Freddie Mac and will directly affect the housing market in a number of ways. For example, prices for mortgage-backed securities in the mortgage futures market (which are an indicator of investor demand for mortgages) would change very quickly if information were made available suggesting that the Enterprises would significantly alter their role in the mortgage market. Because mortgage rates are very sensitive to price changes in the futures market, the disclosure of the type of non-public information contained in response to Plaintiffs' Requests No.'s 1 (to the extent it seeks documents relating to ongoing and future operations of the Enterprises) 6, 7, 8, 9 and 10 would quickly result in higher costs for borrowers. Over time, the increased costs for mortgages would have significant repercussions not just for the nationwide housing market, but for the National economy as a whole.

6

17.    FHFA's decision-making process is likely to be significantly harmed by the forced disclosure in discovery of confidential pre-decisional and deliberative documents. If senior policy makers such as I believe that our deliberations and candid advice will be disclosed, we will be less likely to engage in the thorough, robust and frank discussion required to enable FHFA to make sound decisions in support of its statutory missions.

18.    The potential chilling effect on the FHFA's deliberations from the making available of confidential, non-public, pre-decisional documents is especially great in this case, where the future of the conservatorships and policy decisions made by FHFA are the subject of significant public interest and pre-decisional documents from FHFA would likely be the subject of intense publicity and national debate. Such chilling effect will negatively impact FHFA continuing ability to direct and supervise the Enterprises.

19.    In addition, disclosure of pre-decisional information is likely to mislead the public and confuse investors because documents will be made available that discuss courses of action that may have been under consideration at one time, but were not ultimately taken or were modified.

20.    Although FHFA has not yet reviewed all of the potentially responsive documents, based on the documents that I have reviewed and Plaintiffs' discovery requests, I am confident that many of the documents requested by Plaintiffs contain the type of confidential and potentially market-moving information described above, as well as pertain to matters that are pre-decisional and deliberative in nature.

21.    For example, I have reviewed documents that discuss long-term strategic goals for the conservatorships, including issues pertaining to the Enterprises' future business. These documents reflect ongoing confidential internal agency deliberations and policy discussions.

7

Making these documents available would immediately have a chilling effect on the free exchange of opinions and ideas between Agency personnel. Moreover, these documents contain the type of confidential market-moving information that, if made available, would likely have an immediate impact on financial markets.

22. In sum, the chilling effect engendered by the making available of pre-decisional, confidential and deliberative documents in this case would undoubtedly have an adverse effect on FHFA's exercise of its powers in a sphere crucial to the financial health of the housing finance market. FHFA's internal analysis and deliberations would be inhibited and therefore less robust, FHFA's strategic and operational decision-making would be less effective as a result, and the markets that determine the value of the Enterprises' assets and property would be adversely affected.

23. For the reasons discussed above, FHFA asserts the deliberative process privilege over all of the documents that are responsive to Request for Production No. 1 (to the extent it seeks documents relating to ongoing and future operations of the Enterprises), as this request necessarily seeks information that is exclusively pre-decisional and deliberative in nature. For the same reason, FHFA also asserts the deliberative process privilege over all documents responsive to Requests No.'s 6, 7, 8, 9, and 10 because these requests seek documents necessarily relating to plans about the future and ultimate termination of the conservatorships. Because these documents necessarily contain pre-decisional and deliberative information, an individualized review of all documents responsive to these Requests would be unnecessary and unduly burdensome.

8

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27u day of _____MAY_____ 2014 at Washington, D.C.

By: _Chrisligh H. Dickon_
CHRISTOPHER H. DICKERSON

9

EXHIBIT A

SUBJECT: DELEGATION OF AUTHORITY TO SUBMIT, ON BEHALF OF FHFA, DECLARATIONS ASSERTING PRIVILEGES OVER AGENCY DOCUMENTS

     a.     Pursuant to 12 U.S.C. § 4513(b), I hereby make the following delegation for the Federal Housing Finance Agency (FHFA):

     1.     Delegation of Authority to Submit, on Behalf of FHFA, Declarations Asserting Privileges over Agency Documents. The individuals listed below, as appropriate, hereby are delegated the authority to review FHFA documents for privileges, including the deliberative process privilege and the bank examination privilege, and to submit on behalf of FHFA declarations asserting privileges over such documents, in litigation brought by or against FHFA:

          A.  Chris Dickerson, Senior Associate Director, Division of Enterprise Regulation,
          B.  Alfred Pollard, General Counsel.

     b.     The authority herein may not be re-delegated, except as provided in paragraphs a. herein.

     c.     All actions taken pursuant to the delegations made in paragraph a. shall conform to the internal policies, guidelines, and controls approved by the Director, and shall comply with all applicable requirements of law, regulation, directive, guideline, or Executive Order.

     d.     The delegations made in paragraph a. shall be effective immediately and remain in full force until amended, superseded, or revoked by subsequent order.

Date: 5/29/2014

_____
Melvin L. Watt
Director