# In the United States Court of Federal Claims

No. 13-465 C
(Filed: October 15, 2014)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| FAIRHOLME FUNDS, INC. et al., | * | |
| | * | |
| Plaintiffs, | * | Limiting Access to Protective Order; |
| | * | Risk of Disclosure; Valid Risk of Harm |
| v. | * | |
| | * | |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Charles J. Cooper, Washington, DC, for plaintiffs.

Kenneth M. Dintzer, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiffs, shareholders of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively "the enterprises"), have sued the United States, claiming that it engaged in a taking of their property without just compensation, in violation of the Fifth Amendment to the United States Constitution. By way of background, after the national economy collapsed in 2008, the Federal Housing Finance Agency ("FHFA") placed the enterprises into conservatorship. At the time, the United States Department of the Treasury ("Treasury") provided the enterprises with capital and entered into agreements to purchase securities from them ("government stock"). Plaintiffs allege that while serving as conservator, defendant implemented the so-called "Net Worth Sweep" for the government stock, which changed the dividend due on the stock to defendant from 10% to 100% of all current and future profits, directing all such profits to the Treasury, rather than to plaintiffs. Defendant responded to the complaint by filing a motion to dismiss for lack of jurisdiction and for failure to state a claim. Defendant contends that the court lacks jurisdiction because the enterprises are independent entities and not controlled by the federal government, that plaintiffs' claims are not ripe, and that plaintiffs have failed to state a claim for a regulatory taking. Plaintiffs subsequently moved for discovery in aid of jurisdiction, which the court granted. Because of the sensitive nature of the information responsive to plaintiffs' discovery requests, on August 8, 2014, the court entered a protective order to safeguard that material.

Now pending before the court is plaintiffs' motion to admit one of its experts to the protective order. Defendant filed an opposition to the admission and plaintiffs submitted a reply.

Briefing concerning this motion is complete and the court deems oral argument unnecessary. Because serious injury could flow from the intentional or inadvertent disclosure of the sensitive material that is the subject of the protective order, the court denies plaintiffs' motion.

Plaintiffs seek the admission of J. Timothy Howard to the protective order.  Mr. Howard is the former Chief Financial Officer, and former Vice Chairman of the Board of Directors, of Fannie Mae.  He resigned in 2004, defendant explains, "in the face of allegations of financial improprieties and ongoing investigations into Fannie Mae's accounting practices."  Def.'s Opp'n 1.  Defendant states that in 2006, the Office of Federal Housing Enterprise Oversight ("OFHEO") charged Mr. Howard and two other senior Fannie Mae executives with, among other things, earnings mismanagement, failure to ensure adequate internal controls, and the release of misleading financial reports.  Id. at 2.  According to defendant, the charges were "settled pursuant to consent orders" in which Mr. Howard and his two former colleagues agreed to pay the OFHEO over $31 million.  Id.  Of that settlement amount, Mr. Howard's share was $6.4 million.  Def.'s Ex. C at 1.

Defendant further states that in late 2013, Mr. Howard authored a book that "offers his take on the demise of Fannie Mae and the collapse of the United States home mortgage market."  Def.'s Opp'n 2.  Defendant contends that Mr. Howard "makes clear in his book that he believes [that] he is the victim of the [g]overnment's overregulation of the [e]nterprises[,] and that the 2006 charges against him were unfounded."  Id.  In addition, defendant notes that Mr. Howard has stated publicly that he "desires 'to be part of the debate over the future of Fannie Mae, and its counterpart, Freddie Mac' and that he sees his book as part of that initiative."  Id.  According to defendant, there is "significant reason" to be concerned about Mr. Howard potentially violating the protective order if he is granted access to protected information.  Id.  Specifically, defendant argues, because Mr. Howard believes that he "lost his career and reputation" due to the "[g]overnment's regulation of the [e]nterprises," such "deeply-held beliefs may color" his view of confidential documents in the case and also his willingness to adhere to the protective order, both during and after this litigation.  Id. at 3.  Further, because Mr. Howard owns common and preferred stock in Fannie Mae, defendant contends that he has a personal financial stake in the outcome of this case.  Defendant asserts that as a shareholder, Mr. Howard "would have an incentive to release confidential information in order to increase the price of his shares."  Id.  Defendant concludes that Mr. Howard's access to protected information should be barred because of the risk of its inadvertent or intentional disclosure.  Id. at 4.

In response, plaintiffs argue that defendant has engaged in "character assassination," that Mr. Howard can be trusted to comply with the protective order, and that plaintiffs require his assistance in their litigation and have retained him as a nontestifying financial consultant.  Pls.' Reply 1.  Plaintiffs explain that Mr. Howard and other Fannie Mae executives settled the OFHEO's charges in 2008 by paying $31 million "without any admissions of wrongdoing."  Id. at 3.  Further, plaintiffs reference a comment, discussed in more detail below, made by the trial judge in In re Fannie Mae Litigation, 898 F. Supp. 2d 176 (D.D.C. 2012), as support for Mr. Howard's admission to the protective order.  In re Fannie Mae was a class action brought by Fannie Mae's investors against Fannie Mae, its auditor, and some executives, including Mr. Howard.  Id.  The court granted the defendants' motion for summary judgment in that case.

Pursuant to Rule 26(c)(1)(F) of the Rules of the United States Court of Federal Claims ("RCFC"), the court may issue a protective order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specific way." Moreover, the protective order may "designat[e] the persons who may be present while the discovery is conducted." RCFC 26(c)(1)(E). In this case, the court entered a protective order, which designated the types of individuals who could access protected information. See Docket No. 73, Protective Order, ¶¶ 4-6. The protective order also outlined the process by which an individual could apply for access to protected information, which plaintiffs followed here. Id. ¶ 7.

As a preliminary matter, the court notes that "because the analysis of the question of limiting access [to a protective order] is necessarily fact-bound, there can be no comprehensive formula for decisionmaking." SOLIDFX, LLC v. Jeppesen Sanderson, Inc., 2012 WL 2917116, at *2 (D. Colo. July 16, 2012). Indeed, "the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." Id. Binding precedent instructs that the court "must balance the seriousness of potential injury [that] discovery poses against the need for information in the preparation of a plaintiff's case." Levine v. United States, 226 Ct. Cl. 701, 701 (1981).

Here, defendant previously stated in its motion for a protective order that disclosure of the sensitive information could have a "destabilizing effect on the nation's housing market and economy." See Docket No. 49, Def.'s Mot. for Protective Order 7. Specifically, defendant provided declarations from Melvin L. Watt, Director of the FHFA, and from Michael A. Stegman, Counselor to the Treasury Secretary for Housing Finance Policy at the Treasury. See id., App'x at A1 ("Decl. of M. Watt"), A8 ("Decl. of M. Stegman"). Mr. Watt explained that disclosure of certain information requested by plaintiffs would trigger "extraordinarily deleterious consequence," Decl. of M. Watt ¶ 3, including "hav[ing] a destabilizing effect on the [n]ation's housing market and economy," id. ¶ 7. He described in step-by-step, technical detail how such disclosure would play out in the financial markets, including the process by which it could "set off a chain of volatile and unpredictable reactions in [such] markets that could not be contained." Id. ¶ 9. In addition, Dr. Stegman stated that many of plaintiffs' discovery requests "seek material at the heart of the current and ongoing policy deliberations regarding housing finance reform," Decl. of M. Stegman ¶ 19, and that disclosure of such information could "result in significant misunderstanding, disruption, and confusion in the markets," id. ¶ 28. Both individuals hold senior positions at their respective agencies, and are well-positioned to speak to the ramifications that would result from disclosure of sensitive material in this case. Based upon the information provided in these two declarations and defendant's arguments, the court granted defendant's motion for a protective order "out of an abundance of caution," in an "attempt[] to avoid the dire consequences that defendant claims [would] occur" upon the disclosure of such information. Fairholme Funds, Inc. v. United States, 117 Fed. Cl. 365, 368 (2014).

The court thus examines Mr. Howard's application in light of these circumstances. In his declaration, Mr. Howard states that when the OFHEO filed the charges against him, the agency announced that "civil money penalties . . . could exceed $100 million," in addition to the "repayment of certain compensation packages," of which his share "[was to] exceed[] $25 million." Pls.' Ex. 1, ¶ 5. As Mr. Howard indicates, before the charges against him could be

decided by an administrative law judge, he agreed to settle them by paying $6.4 million to the government.  Id.  Though the court is aware that settlement is not an admission of guilt, nonetheless, there was, at that time, a cloud surrounding Mr. Howard and his two former fellow executives who agreed to repay the United States government over $31 million.

Further, plaintiffs cite to other related litigation, namely, In re Fannie Mae Litigation, 898 F. Supp. 2d 176, a class action that was filed against Mr. Howard and others.  Pls.' Reply 1.  The plaintiffs in that case alleged that the defendants violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (2012) ("section 10(b)"), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 (2011), by intentionally manipulating earnings and violating generally accepted accounting principles, causing losses to investors.  In re Fannie Mae Litig., 898 F. Supp. 2d at 180.  Plaintiffs here reference that case because in granting the defendants' motion for summary judgment, the court mentioned, as an aside, that there was "overwhelming evidence of [Mr.] Howard's good faith."  Pls.' Reply 1.  To the extent that plaintiffs in this case rely on that statement as binding, uncontroverted proof of Mr. Howard's good faith, that argument is not availing.  Because the In re Fannie Mae Litigation court resolved a motion for summary judgment, by definition, it did not weigh evidence and make credibility findings, including any findings regarding Mr. Howard's character.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swish, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment.").  Rather, in its decision, the court determined that there was no genuine dispute of material fact that required trial.  Thus, the court's statement regarding Mr. Howard's good faith could not be considered a holding or finding.  By granting summary judgment, the court held that the plaintiffs had not met their burden of proof to establish the existence of a genuine dispute of material fact regarding scienter under section 10(b) that required trial on the merits.  In re Fannie Mae Litigation, 898 F. Supp. 2d at 190-91.

In this case, defendant has provided sufficient evidence to demonstrate that since the conclusion of the district court litigation, Mr. Howard has worked to restore his reputation.  It is undisputed that he stated in his book that the OFHEO's charges against him were "fictitious" and "invented," Pls.' Ex. 2 at 3, and has characterized the In re Fannie Mae Litigation decision as one that "restored [his] public identity," Pls.' Ex. 1, ¶ 7.  Further, Mr. Howard has affirmatively stated that he "want[s] to re-insert [him]self into the public discussion," Def.'s Ex. D at 1, as he has "an interest in contributing to the discussion of policy issues relating to the reform of the mortgage industry," Pls.' Opp'n 7 n.7.  He engages in public interviews and discussions about the charges against him, Fannie Mae's past and future, and the mortgage industry overall.  See Def.'s Ex. D (Jan. 27, 2014 interview with USA Today).

Plaintiffs put forward that Mr. Howard has a "right[,] as both a citizen and as someone with . . . expertise regarding issues relating to the mortgage industry[,]to comment on the subject."  Pls.' Opp'n 7.  In reaction to defendant's concern that Mr. Howard "wants 'to play a public role in the future of the [e]nterprises,'" plaintiffs respond "[s]o what?"  Id.  So what,

indeed.  Even as the court agrees with plaintiffs that Mr. Howard has the right to opine about such matters and recognizes plaintiffs' litigation needs, his desire for vindication in the public arena and his stock ownership give the court pause with respect to his admission to the protective order.  Thus, the totality of the circumstances—Mr. Howard's history with Fannie Mae, the government, and the mortgage industry; his express desire to be part of the public discussion regarding each; his public discussion of and opining on such matters; and his stock ownership— raise concerns that protected information could be disclosed, inadvertent or otherwise, and that dire consequences would result.  See U.S. Steel Corp. v. United States, 730 F.2d 1465, 1469 (Fed. Cir. 1984) (stating that the Court of International Trade had "clear authority . . . to deny access to all where the specific facts indicate a probability that confidentiality, under any form of protective order, would be seriously at risk"); Levine, 226 Ct. Cl. at 701 (denying individual plaintiff access to the protective order due to the risk that he "desire[d] the confidential materials for purposes other than that of [the] litigation,"); Safe Flight Instrument Corp. v. Sundstrand Data Control Inc., 682 F. Supp. 20, 21-22 (D. Del. 1988) (barring company president from access to confidential information under the protective order because even as he was "a man of great moral fiber," the "potential for abuse" of that information, whether "subconsciously or consciously," was "real"); Ross-Hime Designs, Inc. v. United States, 109 Fed. Cl. 725, 743 (2013) (denying company president entry to the protective order because, among other reasons, he was "actively involved" in the field in question and "[w]as an author in th[at] field," which "create[d] a greater risk [of] inadvertently misus[ing] confidential information"); Maderazo v. Vanguard Health Sys. , 241 F.R.D. 597, 599 (W.D. Tex. 2007) (stating that the court should review the factual circumstances surrounding an individual "to determine whether the [other party's] concern about inadvertent or accidental disclosure is genuine and real" (discussing U.S. Steel Corp., 730 F.2d at 1468)); cf. Standard Space Platforms Corp. v. United States, 35 Fed. Cl. 505, 509 (1996) (determining that former employee posed little risk of disclosing confidential information because he was "no longer active in the [aero]space field" and now "simply s[old life] insurance").

     It bears noting that plaintiffs are not foreclosed from utilizing Mr. Howard's services as a nontestifying expert.  Moreover, despite plaintiffs' argument that Mr. Howard's prior employment with Fannie Mae makes him "uniquely positioned" to assist with "interpreting the complex and often arcane financial information" that may be found in the documents produced during discovery, they provide no reason why other financial experts would not be able to fulfill the same task, particularly since Mr. Howard's employment with Fannie Mae was terminated in 2004, four years prior to the 2008 economic collapse that gave way to its placement in conservatorship.  Pls.' Opp'n 10; see Safe Flight, 682 F. Supp. at 21-22 (barring company president from access to the protective order, despite company's argument that he was "uniquely qualified" to assess documents produced during discovery, and stating that party could find a qualified outside expert); Ross-Hime Designs, 109 Fed. Cl. at 744 (denying plaintiff's president access, and stating that any potential harm to plaintiff was "minimized" because "through its attorneys and independent expert, [it] already ha[d] access to all documents produced" (internal citation and quotation marks omitted)).

     Defendant has clearly defined a serious injury that could occur if protected information is disclosed—not merely to one discrete business, which would, in itself, justify denial of the motion, but rather, to United States financial markets.  Indeed, it is evident in this case that

defendant offers specific facts with a cognizable risk, rather than mere conclusory allegations, of harm.  See Phx. Solutions, Inc. v. Wells Fargo Bank, N.A., 254 F.R.D. 568, 581 (N.D. Cal. 2008) (stating that "issues concerning the scope of protective orders for confidential information entail[] a balancing test for the conflicting interests between the protection of [Federal Rule of Civil Procedure ("FRCP")] 26(c) and the broad mandate of the admissibility of information in discovery conferred by [FRCP] 26(b)(1)," and examining whether the party objecting to access "has a valid risk of harm concerning the disclosure of [] confidential information"[1]).  Overall, the "goals of full disclosure of relevant information and reasonable protection against economic injury 'are in tension and each must be fairly balanced against the other.'"  Safe Flight, 682 F. Supp. at 23 (quoting E.I. du Pont de Nemours & C. v. Phillips Petroleum Co., 1982 WL 63780, at *1 (D. Del. May 17, 1982)).

In sum, the court finds that defendant has presented sufficient evidence to support its claim that dire harm would flow from the disclosure of the sensitive material that is the subject of the protective order.  Defendant has also demonstrated that Mr. Howard is not a dispassionate, independent expert, but rather, a stockholder and former Fannie Mae executive with a personal motivation to resuscitate his career and be vindicated about his leadership of Fannie Mae.  For these reasons, the court will not grant him access to the privileged material.  In reaching its conclusion, the court examined the facts supplied by defendant, including Mr. Howard's public statements concerning his desire for vindication, and evaluated them in light of the grave harm to the nation's economy that would result from the disclosure of information subject to the protective order, inadvertent or otherwise.  However, the court wishes to stress that this ruling should not be misconstrued as an adverse ruling concerning Mr. Howard's character.  The court has not concluded that Mr. Howard is untrustworthy, but has rather determined that the need to protect United States financial markets from the consequences that would flow from the deliberate or inadvertent disclosure of sensitive material trumps Mr. Howard's request for access.  Accordingly, because disclosure of the protected information could place this nation's financial markets in jeopardy, a risk that the court is not willing to take, especially in light of the fact that Mr. Howard is not the sole expert available to assist plaintiffs, Mr. Howard is **DENIED** entry to the protective order in this case.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[1] "To the extent permitted by this court's jurisdiction," the RCFC "shall be consistent with the FRCP . . . ."  RCFC 83(a).